UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KIMBERLY SALERNO,

Plaintiff,

v.

CREDIT ONE BANK, N.A.,

Defendant.

_____

**DECISION
and
ORDER**

--------------------------

**REPORT
and
RECOMMENDATION**

**15-CV-516V(F)**

APPEARANCES:   LAW OFFICES OF KENNETH R. HILLER
Attorneys for Plaintiff
KENNETH R. HILLER,
SETH ANDREWS, of Counsel
6000 North Bailey Avenue, Suite 1A
Amherst, New York   14226

SESSIONS, FISHMAN, NATHAN & ISRAEL, LLC
Attorneys for Defendant
ALLISON L. CANNIZARO,
AARON R. EASLEY, of Counsel
3 Cross Creek Drive
Flemington, New Jersey 08822

**JURISDICTION**

This action was referred to the undersigned for all pretrial matters by order of

Hon. Lawrence J. Vilardo filed January 4, 2019 (Dkt. 31). It is now before the court on

Defendant's motion to vacate an arbitration award (Dkt. 29); Defendant's motion to seal

pursuant to Local R. Civ.P. 5.2 filed December 21, 2018 (Dkt. 30); Plaintiff's cross-

motion to confirm the arbitration award, and for post-award pre-judgment interest, filed

January 11, 2019 (Dkt. 35).[1]

_____

[1] Motions to vacate or confirm an arbitration award are dispositive. *See Gwynn v. Clubine,* 302
F.Supp.2d 151, 170 (W.D.N.Y. 2004) (adopting undersigned's report and recommendation denying the
plaintiff's petition to vacate arbitration award and granting defendant's petition to confirm); motions to seal

## BACKGROUND

This action alleging Defendant's violations of the Telephone Consumer Protection Act ("the TCPA"), 47 U.S.C. § 227, was commenced by Plaintiff on June 11, 2015 (Dkt. 1); an Amended Complaint was filed June 30, 2015 (Dkt. 3). Defendant's answer was filed July 23, 2015 (Dkt. 7) asserting as an affirmative defense that Plaintiff's claim, alleging 466 phone calls to Plaintiff's cellular telephone number without Plaintiff's prior express consent in violation of the TCPA, was subject to arbitration. Dkt. 7 at 6 ¶ 13. On August 9, 2015, Defendant moved, pursuant to the Federal Arbitration Act ("the FAA"), 9 U.S.C. §§ 2-4, to compel arbitration and stay further proceedings pending the requested arbitration (Dkt. 9). By Decision and Order, filed October 29, 2015, Senior District Judge John T. Curtin, based on the parties' Visa/Mastercard Cardholder Agreement, Disclosure Statement and Arbitration Agreement dated May 9, 2012 ( "the Cardholder and Arbitration Agreement" or "the Agreement"), granted Defendant's motion. Dkt. 21 ("the Decision and Order" or "the D&O"). Specifically, Judge Curtin determined that as result of Plaintiff's use of a credit card Defendant issued to Plaintiff based on Plaintiff's on-line application, Plaintiff had agreed to the Cardholder and Arbitration Agreement, Plaintiff's TCPA claims were within the scope of the Agreement authorizing arbitration of all claims arising under the Agreement which included all claims in connection with communications by Defendant to Plaintiff related to Plaintiff's account as provided in the Cardholder and Arbitration Agreement, see Dkt.

---

are non-dispositive, see *Grand v. Schwarz*, 2018 WL 1604057 at *1 n. 1 (S.D.N.Y. Mar. 28, 2018) (citing 28 U.S.C. § 636(b)(1)(A) in finding motion to seal is nondispositive); motions to award interest are dispositive, see *Padberg v. McGrath-McKechnie*, 2007 WL 951929, at ** 1-2 (E.D.N.Y. Mar. 27, 2007) (United States Magistrate Judge acting upon the parties' consent denying motion for reconsideration of post-judgment interest on settlement), *aff'd*, 295 Fed.Appx. 455 (2d Cir. 2008).

34-6 at 5, as well as claims based on any contract or statute, and that Plaintiff's TCPA claims were therefore arbitrable. *See* Decision and Order at 5-10. In accordance with the Decision and Order, Defendant initiated arbitration administered by the American Arbitration Association ("the AAA") which, on February 17, 2016, confirmed appointment of James C. Moore as the arbitrator ("Arbitrator Moore") with arbitration to be conducted under the AAA's Rules. Dkt. 34-2 at 2. The initial arbitration hearing was conducted on August 7 and December 4, 2017. At the hearing three witnesses testified: Plaintiff, Plaintiff's companion, Justin Kroll ("Kroll"), and Defendant's representative Gary Harwood, Defendant's Vice-President for Portfolio Services ("Harwood" or "Defendant's Vice-President"). The hearing was closed on January 15, 2018. Based on the testimony at the hearing and consideration of the TCPA and related caselaw, Arbitrator Moore found that Defendant violated TCPA § 227(b)(1)(A) by making 466 telephone calls to Plaintiff's cell-phone without Plaintiff's express prior consent as required by the TCPA using an automatic telephone dialing system and awarded Plaintiff damages in the amount of $233,000 as provided by TCPA § 227(b)(5)(B) ($500 penalty per call), the AAA's fees in the amount of $2,400, and an arbitrator's fee of $7,938.64. Dkt. 34-2 at 9-10 ("the First Arbitration"). Arbitrator Moore also determined Defendant's TCPA violations, a finding supported by Harwood's testimony that Defendant utilized an automatic telephone dialing system to make the disputed calls, *see* Dkt. 34-2 at 4, were not intentional and declined to award treble damages pursuant to TCPA § 227(b)(3). *See* Dkt. 34-2 at 9. Thereafter, as permitted by the Cardholder and Arbitration Agreement, Defendant requested a second *de novo* arbitration before a three-member panel of neutral arbitrators. *See* Dkt. 34-6 at 6. The second arbitration hearing was

3

conducted June 26, 2018 in Rochester, New York, before arbitrators Richard D. Rosenbloom, Jordan R. Pavlus and Peter A. Karl, III ("the Arbitrators" or "Panel") at which Plaintiff, Kroll, and Harwood again testified. Dkt. 34-4 at 2. Thereafter, on September 21, 2018, the Arbitrators issued their decision, Dkt. 34-3 at 1-2 ("the Arbitrators' Award," "the Panel's Award," or "the Award"), awarding Plaintiff $232,500 in statutory damages, finding Defendant's non-willful violations of the TCPA in making 465 telephone calls to Plaintiff's cellular telephone number without Plaintiff's express prior consent together with $2,900 in AAA's arbitration fees and $9,119.45 for the arbitrators' fees. Dkt. 34-3 at 1-2 ("the Second Arbitration").

As noted, Defendant's motion to vacate the Arbitrators' Award pursuant to the Federal Arbitration Act ("the FAA"), specifically 9 U.S.C. § 10, and to seal was filed December 21, 2018 (Dkt. 29) ("Defendant's Motion to Vacate/Defendant's Motion to Seal"). On the same date, Defendant also filed Memorandum In Support of Credit One Bank, N.A.'s Motion To Vacate Arbitration Award (Dkt. 29-1) ("Defendant's Memorandum") together with Declaration of Aaron R. Easley In Support of Motion to Vacate Arbitrators Award dated, December 21, 2018 (Dkt. 29-2) ("Easley Declaration") attaching Exhibits 1-8 ("Easley Decl. Exh(s). __"), Easley Decl. Exh. 1, a copy of the Arbitrators' Award, Easley Decl. Exh. 2, a copy of the Cardholder and Arbitration Agreement, Easley Decl. Exh. 3, the Arbitration Hearing Transcript, Easley Decl. Exh. 4, Defendant's Pre-Arbitration Hearing Brief, Easley Decl. Exh. 5, Defendant's Solicitation Letter to Plaintiff, Easley Exh. 6, Defendant's call log of inbound calls to Defendant from Plaintiff's cell phone, Easley Exh. 7, Defendant's Post-Arbitration Brief, and Easley Decl. Exh. 8, Defendant's Post Arbitration Reply brief. Easley Exhs. 1, 3, 4, 6, 7 and 8 were

filed by Defendant under seal. Also attached to the Defendant's Memorandum was Credit One Exhibit E, Dkt. 29-3, a copy of the Cardholders Statement, Disclosure Statement and Arbitration Agreement, and Exh. D, a copy of Defendants' Credit Card Application Form, Dkt. 29-4, and a Proposed Order On Motion to Vacate Arbitration Award, Dkt. 29-5.

Plaintiff's Cross-Motion to Confirm the Arbitrators' Award, pursuant to the FAA, 9 U.S.C. § 9, for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) ("Rule 12(c)") for post-arbitration and pre-judgment award interest was filed January 11, 2019 (Dkt. 35) ("Plaintiff's Motion to Confirm;" "Plaintiff's Rule 12(c) Motion" and "Plaintiff's Motion for Post-Award and Pre-Judgment Interest"), together with Plaintiff's Memorandum of Law In Opposition To Motion To Vacate Arbitration Award (Dkt. 34) ("Plaintiff's Memorandum"), Affirmation of Kenneth R. Hiller, dated January 11, 2019 (Dkt. 34-1) exhibits 1-8 ("Hiller Declaration Exh(s). __") including Hiller Decl. Exh. 1 Award of Arbitrator dated January 11, 2018 (Dkt. 34-2), Exh. 2 Award of Arbitrators, dated September 2, 2018 (Dkt. 34-3), Exh. 3, Transcript of Hearing Before the Arbitrators on June 26, 2018 (Dkt. 34-4), Exh. 4, a copy of Defendant's Credit Card Application used by Plaintiff to obtain a credit card from Defendant (Dkt. 34-5), Exh. 5, a copy of the Credit Card Agreement, Disclosure Statement and Arbitration Agreement between Plaintiff and Defendant, Dkt. 34-6, Exh. 6, a Log of Telephone Calls to Plaintiff's Cellular Telephone Number for the Period December 3, 2014 to May 27, 2015, Dkt. 34-7, Exh. 7, a copy of Plaintiff's Pre-Hearing Brief to the Arbitration Panel, dated August 17, 2018, (Dkt. 34-8) and Exh. 8, Plaintiff's Post-Hearing Brief to the Arbitration Panel dated August 29, 2018 (Dkt. 34-9). These documents, a response to Defendant's motion to

seal, were administratively sealed by the Clerk of Court pending the court's determination of Defendant's Motion to Seal.

# FACTS[2]

On May 9, 2012, Plaintiff, Kimberly Salerno ("Plaintiff"), who then lived in this district with one Justin Kroll ("Kroll"), applied on-line to Defendant Credit One Bank, N.A., ("Defendant," "Credit One" or "Bank One") for a credit card in her name only using Defendant's credit card application, which Defendant mailed to Plaintiff on April 27, 2012. In her application to Defendant Plaintiff provided, as Defendant requested, only her land-line telephone number ending in 3439 ("the 3429 number") as a contact telephone number because at that time Plaintiff lacked cellular phone service; Plaintiff's credit card application to Defendant was signed by Plaintiff. Thereafter, Defendant accepted Plaintiff's application and mailed to Plaintiff a Bank One credit card along with Defendant's printed form, Defendant's Visa/Master Card Cardholder Agreement, Disclosure Statement and Arbitration Agreement ("Cardholder and Arbitration Agreement" or "Agreement") which Plaintiff did not recall, but did not deny, receiving. Following her receipt of Defendant's credit card, Plaintiff's activated her new account and credit card with Defendant using Defendant's interactive voice response system ("IVR"). On May 21, 2012, Plaintiff commenced actual use of the Bank One credit card by making regular retail purchases and payments, upon receiving Defendant's monthly billing statements, to Defendant for Plaintiff's purchases representing Plaintiff's

---

2  Taken from the pleadings and papers filed in this action.

agreement to the terms of the Cardholder and Arbitration Agreement. As relevant, the

Cardholder and Arbitration Agreement included a provision which stated.

> 19.  COMMUNICATIONS: You expressly authorize Credit One Bank or
> its agents to contact you at any phone number (including mobile,
> cellular/wireless or similar devices) or email address you provide at
> anytime, for any lawful purpose. The ways in which we may contact
> you include live operator, automatic telephone dialing system
> (autodialer), prerecorded message, text message or email. Phone
> numbers and email addresses you provide include those you give
> us, those from which you contact us or which we obtain through other
> means. Such lawful purposes include, but are not limited to, account
> transactions, or servicing related matters; . . . collection on the
> Account . . . ."

Dkt. 34-6 at 4. The Agreement also defined the term "the Account" as "Your

Visa®/Mastercard® Account," Dkt. 34-6 at 2; the term "your" was further defined by the

Agreement as "all persons . . . authorized to use the Card Account." Id. Defendant

does not contend Kroll was an authorized user on Plaintiff's account.

In March 2013, Plaintiff obtained a cellular phone service with an assigned

cellular telephone number having 0301 as the last four digits of the number ("the 0301

cell number" or "Plaintiff's cell number"). Later, in 2014, both Plaintiff and Kroll, who

also had a credit card issued by Defendant, became in arrears with Defendant on their

respective Bank One accounts. According to Defendant's business records, i.e., an

automated telephone number identification report ("ANI Report"), on October 23, 2014

Defendant received a phone call from Plaintiff's cell number in which the caller, not

identified by the ANI Report, requested information regarding Kroll's Bank One credit

card account. Before providing its response, Defendant's system verified the legitimacy

of the call by requiring the unidentified caller to correctly provide the last four digits of

Kroll's Social Security number which the caller provided. Plaintiff' testified she had no

specific recollection of making this call but admitted she may have been the caller; Kroll denied ever using Plaintiff's cell phone to contact Defendant regarding his credit card account. Plaintiff denied she ever provided her cell number to Defendant.

Thereafter, between December 3, 2014 and May 27, 2015, Defendant's third-party vendors, iNergizer, First Contact, and TPUSA, credit card account collection agencies working on Defendant's behalf, contacted Plaintiff's 0301 cell number on 465 occasions in an attempt to collect the then outstanding balance on Kroll's account with Defendant as Plaintiff had previously brought her account to a current status, as determined by the Arbitrators[3] until Plaintiff called Defendant on May 27, 2015 and requested Defendant stop calling Plaintiff's cell number, at which time Defendant ceased calling Plaintiff's 0301 cell number.[4] According to Defendant's records, 471 calls were placed to Plaintiff's cell number but only three pertained to Plaintiff's account; the balance of the calls directed to the 0301 number were in relation to Kroll's account.

## DISCUSSION

Under the FAA § 10(a), federal court review of an arbitration award is limited to impropriety in the arbitrators' conduct such as refusing to consider evidence, exceeding the arbitrators' powers, partiality, corruption or fraud. *See Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004) (citing FAA § 10(a); *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003)). In addition to these statutory grounds, as the FAA provides, the Second Circuit authorizes district courts to vacate an

---

[3] In the First Arbitration, Arbitrator Moore found there were 466 such calls. The record does not explain this inconsistency. *See* Dkt. 34 at 3 n. 2.
[4] The record does not specify which vendor placed the calls, however, Defendant does not dispute it is responsible for all of the calls regardless of which vendor in fact made them.

arbitration award if the award "'exhibits a manifest disregard of law.'" *Id.* (quoting *Goldman v. Architectural Iron Co.*, 306 F.3d 1214, 1216 (2d Cir. 2012) (quoting *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 821 (2d Cir. 1997))) *See also Schwartz v. Merrill Lynch & Co.*, 665 F.2d 444, 451-52 (2d Cir. 2011); *Porzig v. Dresdner, Kleinwort, Benson, N.A., LLC*, 497 F.3d 133, 139 (2d Cir. 2007). The "'manifest disregard of law doctrine'" is one that is "'severely limited'" and may be only used in "'exceedingly rare instances,'" *id.* (quoting *Duferco*, 333 F.3d at 389), to give "'extreme deference to arbitrators.'" *Id.* (quoting *DiRussa*, 121 F.3d at 821). "'[A] simple error of law or a failure [by the arbitrators] to understand or apply it'" does not warrant vacating the award unless the opposing party "clearly demonstrates 'that the panel intentionally defied the law.'" *STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC*, 648 F.3d 68, 78 (2d Cir. 2011) (quoting *Duferco*, 333 F.3d at 389).

It is well-established that in order to promote the use of arbitration as a means to resolve disputes efficiently and cost-effectively, arbitration awards are subject to "very limited" judicial review. *Rich v. Spartis*, 516 F.3d 75, 81 (2d Cir. 2008) (citing *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir.1997)). The party moving to vacate an arbitration has a very high burden of proof to avoid confirmation. *STMicroelectronics, N.V.*, 648 F.3d at 74 (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir.2006)). Absent grounds for revocation as provided in the FAA, a request for confirmation of an award and judgment based on the award should be summarily granted.[5] *See Ottley v. Schwartzberg*, 819 F.2d 373, 375

---

[5] In addition to Plaintiff's Cross-Motion to confirm the Award pursuant to FAA § 9, Plaintiff also moves, as noted, for judgment on the pleadings under Rule 12(c); however, such an additional ground for relief is unnecessary as a motion to confirm an award is procedurally sufficient. *See D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) ("confirmation of an arbitration award is 'a summary

(2d Cir. 1987) (absent statutory ground to vacate or modify arbitration award, timely motion to confirm such award must be summarily granted (citing 9 U.S.C. §§ 9, 10, 11)). In keeping with the deference to be accorded to an arbitration award, a "arbitrator's rationale for an award need not be explained, and the award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case." *D.H. Blair, & Co.*, 462 F.3d at 110 (internal quotation marks and citations omitted). "Deference to the arbitrators' interpretation of contracts is especially strong." *Century Indem. Co.*, 2012 WL 4354816, at *6. "'[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, a court's conviction that the arbitrator has committed serious error in resolving the disputed issue does not suffice to overturn his decision.'" *Id.* (quoting *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co.*, 564 F.3d 81, 86 (2d Cir. 2009) (internal quotation marks and citations omitted)).

According to the Second Circuit, "[a]n arbitral award may be vacated for manifest disregard of the law 'only if a reviewing court . . . find[s] both that (1) the arbitrators knew of a <u>governing legal principle</u> yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case,'" *Id.* (quoting *Banco de Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 263 (2d Cir. 2003) (quoting *Greenberg v. Bear Stearns & Co.*, 220 F.3d 22, 28 (2d Cir. 2000))).[6] Further, mere disagreement by a court with the arbitrator's

---

proceeding that merely makes what is already a final arbitration award a judgment of the court . . . .'" (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984)). Upon confirmation pursuant to FAA § 9 the court directs the Clerk to enter judgment for the prevailing party and to close the file. *See Hamilton v. Navient Solutions, LLC*, 2019 WL 633066, at *6 (S.D.N.Y. Feb. 14, 2019) (confirming arbitrators' award in favor of respondent and directed entry of judgment in respondent's favor upon arbitrators' award). Thus, Plaintiff's Rule 12(c) Motion is redundant and should be DISMISSED as such.

[6] Unless indicated otherwise, all underlining added.

assessment of the evidence in support of an award is an insufficient basis upon which to vacate an award under the manifest error of law doctrine. *See Wallace,* 378 F.3d at 192-93 (citing *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.,* 304 F.3d 200, 212, n. 8 (2d Cir. 2002)). "'[T]the Second Circuit does not recognize manifest disregard of the evidence as a proper ground for vacating an arbitrator's award.'" *Id.* (quoting *Success Sys., Inc. v. Maddy Petroleum Equip., Inc.,* 316 F.Supp.2d 93, 94 (D.Conn. May 3, 2004)). Rather, '[t]o the extent that a federal court may look upon the evidentiary record of an arbitration proceeding at all, it may do so *only* for the purpose of discerning whether a colorable basis exists for the panel's award so as to assure that the award cannot be said to be the result of the panel's manifest disregard of the law." *Id.* at 193.

Here, Defendant asserts that in finding Defendant had violated the TCPA, as stated in the Arbitration Award, the Arbitrators engaged in a manifest disregard of the law. Specifically, Defendant argues that in reaching its conclusion the Panel disregarded two recent Second Circuit decisions which were brought to the Panel's attention prior to the Panel's Award.[7] Dkt. 29-1 at 3-4. First, according to Defendant, the Panel failed to correctly apply a 2017 Second Circuit decision, *Reyes v. Lincoln Automotive Fin. Servs.,* 861 F.3d 51 (2d Cir. 2017) ("*Reyes*"). In *Reyes,* plaintiff was a lessee under an automobile lease with defendant, an automobile lessor, which had included a request for plaintiff's cellular telephone number as a number at which defendant could contact plaintiff and which plaintiff provided to defendant in his lease

---

[7] Plaintiff asserts that under the Agreement, Nevada, not Second Circuit applies. However, the Arbitration was initiated as permitted by the Agreement based on Plaintiff's claims as pleaded in Plaintiff's TCPA action in this court and Plaintiff provides no indication that Nevada law provides any grounds for the relief Plaintiff seeks similar to the TCPA. Accordingly, the court considers the issues raised by Defendant to require application of Second Circuit federal law to the issues raised on Defendant's motion to vacate.

application upon which the lease was accepted by plaintiff and the dealership which leased the subject leased automobile on behalf of defendant to plaintiff. *Reyes*, 861 F.3d at 53-54. Shortly after leasing the vehicle, plaintiff defaulted on his required monthly lease payments and defendant attempted to communicate with plaintiff using the telephone number plaintiff had provided in the lease application in order to cure the default. *Reyes*, 861 F.3d at 54. Plaintiff also alleged in plaintiff's TCPA action that he had mailed a letter to defendant requesting defendant stop attempting to reach plaintiff at the telephone number plaintiff had provided to defendant in the lease application; however, the defendant claimed it never received plaintiff's putative letter request to cease calling plaintiff. *Reyes*, 861 F.3d at 54. The record showed defendant had called plaintiff's number 141 times with a representative on the line, and also called plaintiff 389 times using a pre-recorded message. *Id.* In his TCPA suit, which the district court had dismissed on summary judgment, plaintiff sought $720,000 in statutory damages based on defendant's alleged violations of the TCPA, specifically, 47 U.S.C. § 227(b)(1)(B), which prohibits any call to a residential telephone line using an artificial or prerecorded message without the "prior express consent of the called party." TCPA Section 227(b)(1)(A) also prohibits any telephone call using an automatic telephone dialing system or an artificial or prerecorded voice without "the prior express consent of the called party." The question on appeal to the Second Circuit in *Reyes* thus was whether the TCPA permits a plaintiff to revoke his prior express consent previously provided to a creditor required by the TCPA to permit either prerecorded calls to a home telephone number or calls to a cellular phone using an automatic telephone dialing

system ("ATDS"). *Reyes*, 861 F.3d at 55.[8, 9] In its decision, the Second Circuit noted that in following two circuit court decisions, *Gager v. Dell Fin. Servs, LLC,* 727 F.3d 265, 268 (3d Cir. 2013) ("*Gager*") and *Osorio v. State Farm Bank, F.S.B.,* 746 F.3d 1242, 1253 (11th Cir. 2014) ("*Osorio*"), the Federal Communication Commission ("FCC") issued a ruling that the TCPA permitted a called party to revoke a previously given express consent to receive such calls. *See Reyes*, 861 F.3d at 56 (citing and quoting *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 30 F.C.C. Rcd. 7961, 7993-94 (2015), 2015 WL 4387780, at * 21 ("the 2015 FCC Ruling"). In reaching its conclusion that, despite the 3d Circuit and 11th Circuit holdings in *Gager* and *Osorio,* upon which the FCC relied in including the right to revoke consent by a consumer in the 2015 FCC Ruling, the Second Circuit found that in those cases (*Gager* and *Osorio*) the plaintiff's prior express consent was "unilaterally given" in connection with credit card applications, like Plaintiff's alleged consent in the instant case, whereas in *Reyes* the telephone number called by defendant, as provided by plaintiff, was a required element of the lease signed by plaintiff thereby constituting a "bargained-for-consideration in a bilateral contract." *Reyes*, 861 F.3d at 56. Based on its reading of common law principles applicable to the legal concept of consent, in *Reyes*, the Second Circuit determined that, because the plaintiff's telephone number was stated in the bilateral lease agreement between the parties, such a bargained-for element was a binding element of the parties' agreement and thus not subject to a

---

[8] The TCPA defines an ATDS as "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (b) to dial such numbers." 47 U.S.C. § 227(a)(1)(A), (B).

[9] On appeal, the court also considered whether the district court improperly granted summary judgment based on its finding that plaintiff's deposition testimony asserting mailing his request to defendant was insufficient to avoid summary judgment was in error because it entailed consideration of plaintiff's credibility which presented a jury question as the Second Circuit determined.

unilateral revocation by plaintiff under applicable common law as a lessee, and that nothing in the text of the TCPA indicated Congress intended to alter this established principle of the common law of contracts. *Id.* at 57-58. The court also noted that whether a TCPA plaintiff's prior express consent should be subject to revocation despite inclusion as a bargain-for element in a standard form sales agreements, like defendant's lease, was an issue to be addressed to Congress. *Id.* at 58-59.

Defendant's contention that the Arbitration Panel disregarded *Reyes* rests upon the language in the Cardholder and Arbitration Agreement which stated, *inter alia*, that Plaintiff had granted Defendant permission to call Plaintiff for "any lawful purpose," such as "collection" of an overdue payment on her credit card account, *i.e.*, "the Account," as stated in the Agreement, *see* Dkt. 34-6 at 5; Dkt. 29-1 at 7, at any telephone number Plaintiff provided to Defendant, such as her previously provided land-line number, Facts, *supra*, at 6-7, as well as at any number "from which you [Plaintiff] contact us,"[10] such as Plaintiff's 0301 cell number which in this case was used, presumably by Plaintiff (or possibly Kroll with Plaintiff's permission), to call Defendant on October 23, 2014, concerning Kroll's account thus associating through Defendant's ANI system Plaintiff's cell number with Kroll's account in Defendant's record-keeping system and Defendant's vendors' dialing systems should Defendant have need to contact Kroll regarding his account such as for collection of overdue payments. *Id. See also* Facts, *supra*, at 7-8. Defendant's argument misreads the Arbitrators' Award and misapplies the holding in *Reyes.*

---

[10] Unless indicated otherwise, all bracketed material added.

First, the Panel did not find that Plaintiff had attempted to revoke, the sole issue in *Reyes*, whatever prior express consent Plaintiff arguably had provided to Defendant pursuant to the terms of the Cardholder and Arbitration Agreement. Rather, the Panel found based on the evidence at the hearing that upon activating her Bank One credit card Plaintiff had not provided the prior express consent required by the TCPA to call Plaintiff 465 times at the 0301 number using an ATDS. Here, unlike in *Reyes*, Plaintiff's consent upon which Defendant relies for calling the 0301 number regarding Kroll's account was not specifically provided in a bargained-for-bilateral agreement. Rather, it was provided unilaterally through Plaintiff's acceptance, manifested by implication through Plaintiff's use of her assigned credit card, of the Cardholder and Arbitration Agreement as Judge Curtin determined. *See D&O*, Dkt. 21 at 8. Thus, because the issue in *Reyes,* unlike that in the arbitration proceeding in the instant case, concerned the plaintiff's putative revocation of a prior express consent to call a particular telephone number provided by plaintiff, as an element of a bargained-for bilateral agreement, not, as with Plaintiff's credit-card application to Defendant, a unilateral business agreement, the Panel, in finding Defendant had, as was Defendant's burden, failed to establish Plaintiff's prior express consent to receive the calls at issue, did not disregard the holding in *Reyes.* Moreover, as Defendant's calls to the 0301 number were primarily related to collect Kroll's overdue account, the Panel, by its interpretation of the Agreement's definition of consent, as expressly limited by the Agreement to Defendant's collections attempts directed to Plaintiff's own account, Dkt. 34-5 at 5, ¶ 19, could also have reasonably found Plaintiff had not expressly consented to such calls on her 0301 number because the calls did not pertain to any of Defendant's collection efforts

directed to her account and thus were beyond the scope of the Cardholder and Arbitration Agreement's definition of Defendant's authority, and the extent of Plaintiff's permission as defined in the Agreement, to contact Plaintiff at a subsequently provided telephone number, *i.e.*, the 0301 number. Such contractual interpretations are especially within the arbitrators' purview. *See Century Indem. Co.,* 2-10 WL 4354816, at * 6. Even assuming the Agreement authorized Defendant to contact the 0301 number which its ANI system captured upon its use in October 2014 as a call for a "lawful purpose," as the Agreement in paragraph 19 also states, Dkt. 34-6 at 4, the Panel could reasonably have determined such 'consent' was merely implied, *see Latner v. Mount Sinai Health System, Inc.,* 879 F.3d 52, 54 (2d Cir. 2018) (express consent required under TCPA); see also *Levy v. Receivables Performance Management, LLC,* 972 F.Supp.2d 409, n. 12 (E.D.N.Y. 2013) ("'Express' means 'explicit,' not, as [defendant] seems to think, 'implicit.'" (quoting *Edeh v. Midland Credit Mgmt.,* 748 F.Supp.2d 1030, 1038 (D.Minn. 2010))), not express. It can also be reasonably inferred that the Panel could have found, as a matter of contract interpretation, the calls to Plaintiff's 0301 number to collect on Kroll's account were made without Plaintiff's express consent, as defined in the Agreement, to be in violation of the TCPA and thus the calls were not made for a "lawful purpose." There was therefore a colorable basis, *see Wallace,* 378 F.3d at 193, for the Panel's determination that Defendant failed to demonstrate, as was its burden, that it had obtained Plaintiff's "prior express consent" to the 465 calls Defendant placed to Plaintiff's 0301 number in connection with Kroll's account. As noted, Discussion, *supra,* at 15 (citing caselaw), contract interpretational issues are especially within the purview of arbitrators such that courts are loath to

second-guess them. Accordingly, the Panel's award was not the result of any failure to apply a governing principle of law that was "well-defined, explicit and clearly applicable to the case," *Wallace*, 378 F.3d at 90 (internal quotation marks and citations omitted),[11] nor did it represent any defiance of otherwise applicable law, *StMicroelectronics, N.V.*, 648 F.3d at 78, particularly, as Defendant argues, as held in *Reyes*, and Defendant's motion to vacate the Award on this ground is without merit.

Defendant's second ground for vacatur is similarly insufficient to require vacating the Award. In particular, Defendant contends that the Panel's finding that Defendant's calls to Plaintiff's 0301 cell number using an ATDS as required by the TCPA also constituted a "manifest disregard of law," because such finding violated the Second Circuit's recent, June 29, 2018, decision in *King v. Time Warner Cable*, 894 F.3d 473 (2d Cir. 2018) ("*King*"), Dkt. 29-1 at 16. Although the *King* decision was issued two days after the Second Arbitration hearing concluded, Defendant brought the *King* decision to the Arbitrators' attention through post-hearing briefing . Dkt. 29-1 at 4. Specifically, in *King*, the Second Circuit agreed with the D.C. Circuit's earlier recent, March 16, 2018, decision in *ACA Int'l v. F.C.C.*, 885 F.3d 687 (D.C.Cir. 2018) ("*ACA Int'l*"), which had invalidated a 2015 FCC Ruling that had purported to clarify the meaning of the term

---

11 Significantly, the Second Circuit has recognized that where a subsequent telephone number is not "provided during the transaction that resulted in the debt owed" it was not provided with the consumer's prior express consent "sufficient to avoid the creditor's liability [under the TCPA] for collection calls to such number." *See Nigro v. Mercantile Adjustment Bureau, LLC*, 769 F.3d 804, 806 (2d Cir. 2014) ("*Nigro*"). In *Nigro*, the court did not reach the question whether a telephone number subsequently provided to a creditor is "given as part of a continuing 'transaction' . . . that 'resulted in the debt owed,'" and thus constitutes prior express consent as a defense to a TCPA claim. *Nigro* was relied upon by Arbitrator Moore in the First Arbitration, *see* Dkt. 34-2 at 8, in finding for Plaintiff and was brought to the Panel's attention in the Second Arbitration during Plaintiff's opening statement to the Panel. *See* Dkt. 34-4 at 7. Thus, the Panel could well have considered *Nigro's* holding in concluding Plaintiff had not provided the prior express consent required by the TCPA. The court's research reveals no subsequent holdings by the Second Circuit resolving this issue thereby further demonstrating the Panel did not, in concluding Plaintiff's consent was not express, violate the manifest error of law doctrine.

"capacity" as used in the TCPA's definition of an ATDS. As noted, Discussion, *supra*, at

12 n. 8, the TCPA defines an ATDS in 47 U.S.C. § 227(a)(1) ("§ 227(a)(1)") as a device

or dialing system which has the capacity to both store or produce telephone numbers to

be called using a random or sequential number generator and to dial such numbers.

Specifically, the D.C. Circuit in *ACA Int'l* found the 2015 FCC ruling's definition of the

term "capacity" to be overly broad in that it thereby impermissibly extended the definition

of an autodialer to a wide range of smart phones used by millions well-beyond

Congress's purpose in enacting the TCPA, *ACA Int'l*, 885 F.3d at 696, 698-99, and

confusingly determined dialing systems used by collections agents, predictive dialers,

were ATDSs regardless of whether such dialing systems could store or generate

random or sequential telephone numbers for calling and dialing them. *ACA Int'l*, 885

F.3d at 702-03. In *King*, the Second Circuit, agreeing with the D.C. Circuit's

construction of the § 227(a)(1) in *ACA Int'l*, held that the term "capacity," as used in §

227(a)(1) in defining an alleged autodialer meant the device's or system's present

capacity, rather than its technologically potential capability which could be feasibly later

created by additional software or program modifications to the alleged computerized

autodialer to perform all the elements of the TCPA's definition of an autodialer "including

the storage or production of telephone numbers to be called," "using a random or

sequential number generator," and the capacity "to dial such numbers," 47 U.S.C. §

227(a)(1)(A), (B), regardless of whether the device "has actually done so in a particular

case." *King*, 894 F.3d at 480.

Defendant further argues a dialing system's capability to generate random or

sequential numbers to be dialed would be of little value to creditors like Defendant

seeking to contact a consumer at a telephone connected to such person regarding their account. *See* Dkt. 29-1 at 15 (referencing Dkt. 24-4 at 46). Defendant therefore maintains, Dkt. 29-1 at 16, that by its agreement with the D.C. Circuit's decision in *ACA Int'l*, to limit the meaning of the term "capacity" in the TCPA's definition of an autodialer to the "present capacity" of the device to execute automated phone calls and to store or produce using a random or sequential generator the telephone numbers to call, the Second Circuit in *King* impliedly rejected other prior FCC rulings, reaffirmed in the 2015 FCC Ruling, which held that predictive dialers were to be considered within the scope of the TCPA's autodialer definition. *See id.* ("The Second Circuit made clear . . . that the old FCC orders no longer control.") (citing *King*, 894 F.3d at 481). In the two prior rulings, the FCC, which has exclusive authority to issue regulations interpreting the TCPA, 47 U.S.C. § 227(b)(2), and which are binding authority on the courts, *see Sterling v. Mercantile Adjustment Bureau, L.L.C.*, 667 Fed.Appx. 344, 345 (2d Cir. 2016) (FCC Rulings regarding the TCPA are binding on courts pursuant to 28 U.S.C. §402(a)9, 405(a)), determined that devices used by telemarketers and collection agencies to communicate with consumers known as "predictive dialers" were within the definition of an autodialer as defined in § 227(a)(1)(A), (B). *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (Declaratory Ruling)*, 23 FCC Rcd. 559 (2008), 2008 WL 65485 (FCC 2008) ("the 2008 FCC Ruling"); Declaratory Ruling 2003 Order, 18 FCC Rcd. 14014, 14091 ¶¶ 131-32, 2003 WL 21517853 (FCC July 3, 2003) (equipment that can dial automatically from a given list of telephone numbers using algorithms to predict "when a sales agent will be available" [to speak with the called party immediately after completing a call with another consumer] –

qualify as autodialers) ("the 2003 FCC Ruling")[12] ("the FCC 2003 and 2008 Rulings").

*See ACA Int'l*, 885 F.3d at 694 (referencing 2015 Declaratory Ruling, 30 FCC Rcd.

7961, 7972). However, as Plaintiff argues, the 2003 and 2008 FCC Rulings pertaining

to whether productive dialers qualify as an ATDS, remain unaffected by either *King* or

*ACA Int'l. See* Dkt. 34 at 14-17. This conclusion is supported by a plain reading of the

Second Circuit's decision in *King* which, making reference to the 2015 FCC Declaratory

Ruling, in which the Commission reaffirmed the FCC 2003 and 2008 Rulings stating that

predictive dialers can be treated as autodialers for TCPA purposes, *King*, 894 F.3d at

478, the Second Circuit did not address, *see King*, 894 F.3d 473 (*passim*), nor could it

have addressed[13] the merits of the FCC's 2003 and 2008 Rulings. Such conclusion is

also consistent with the D.C. Circuit's discussion in *ACA Int'l*, which focused on the

potential scope of the FCC 2015 Ruling's ATDS definition, as in that case the D.C.

Circuit opined that the FCC could, notwithstanding the court's invalidation of the FCC's

2015 Ruling, with regard to the FCC's attempt in the 2015 FCC Ruling to more fully

define an ATDS, particularly the term "capacity," validly determine predictive dialers to

be autodialers, but not in the inconsistent as manner expressed in the FCC 2015

Ruling. *See ACA Int'l*, 885 F.3d at 702-03 (a predictive dialer may be an ATDS if it "can

generate random or sequential numbers to be dialed or can qualify [as an ATDS] even if

lacks that capacity"). In fact, the Second Circuit in *King* specifically declined to

determine whether the defendant's system in that case – an "interactive voice response

---

[12]  At the hearing, Defendant elaborated to the Panel on the actual functioning of an autodialer as a computerized dialing system programmed to automatically call telephone numbers provided to it which dials the number apparently either randomly or sequentially to match the person which answers with a then available agent. *See* Dkt. 34-4 at 9.

[13]  The validity of the 2015 FCC Rulings was referred solely to the D.C. Circuit, *see King*, 894 F.3d at 476, n. 3; there is no basis in the record to support the Second Circuit would have jurisdiction to consider the validity of the FCC 2003 and 2008 Rulings.

system," 894 F.3d at 475, could qualify as an ATDS instead remanding the case to the district court for such determination. *Id.* at 481.[14] Thus, contrary to Defendant's assertion, nothing in *King* indicates that a predictive dialer, if used by Defendant's vendors to make the calls to Plaintiff's cell number on behalf of Defendant, does not constitute an autodialer for TCPA purposes. Additionally, since *ACA Int'l*, numerous courts have concluded the 2003 and 2008 FCC Rulings, finding predictive dialers are ATDSs, remain, notwithstanding the D.C. Circuit's decision, in effect. *See, e.g., McMillion v. Rash Curtis & Assocs.*, 2018 WL 3023449, at *3 (N.D.Cal. June 18, 2018) ("*ACA International* invalidated only the 2015 FCC Order – [it] discusses but does not rule on the validity of the 2003 FCC Order or the 2008 FCC Order," and denying reconsideration of court's pre-*ACA Int'l* order that the dialers at issue "were ATDSs because they possessed 'predictive dialing" capabilities which allowed them to operate without human intervention.") *See also*, Plaintiff's Memorandum, Dkt. 34 at 16-17 (collecting cases). Such caselaw was also submitted to the Panel in Plaintiff's August 17, 2018 Post-Hearing Memorandum. *See* Dkt. 34-8 at 9-10 (collecting cases). Significantly, in the instant case, Harwood testified that Defendant's vendors' dialing system "had elements of predictive dialing." Dkt. 34-4 at 45. *See also* Dkt. 34-4 at 49 ("In the predictive mode the agent doesn't have a say. That's the dialer, the dialing system . . . [that] determine[s] which number to call"). That the dialing system utilized by Defendant's vendors created or generated the sequence of the numbers to call, and called them, on an automated basis, the Panel could reasonably find, as a predictive

---

[14] According to the undersigned's contact with the chambers of Judge Hellerstein, the District Judge in *King*, following remand the *King* case was settled without a judicial finding whether defendant's dialer was an ATDS.

dialer, the dialing system was an ATDS as defined by the TCPA. There was, accordingly, an additional colorable basis for the Panel's conclusion that Defendant's vendors' dialing were predictive dialers and, as such, ATDSs for TCPA purposes. Recently at least one District Court within the Second Circuit has also concluded the FCC 2003 and 2008 Rulings remain valid. *See Jiminez v. Credit One Bank, N.A.*, 377 F.Supp.3d 324, 333-34 (S.D.N.Y. 2019) (holding under the FCC 2003 and 2008 Rulings defendant credit card issuer collection agent used and ATDS that was a predictive dialer where outbound calls used proprietary algorithm to determine how many calls to automatically place to keep customer service representative fully occupied, and system adjusted number of calls placed based on number of customer service representatives available at any given time under FCC 2003 and 2008 Rulings despite *ACA Int'l*'s decision on the FCC 2015 Ruling). As such, nothing in the record supports that in reaching its determination on this issue, the Panel disregarded Second Circuit caselaw that was "well-defined, explicit and clearly applicable to the case," *Wallace*, 378 F.3d at 89 (internal quotation marks and citations omitted), such that the Award was based on a manifest error law. Nor is there any indication that in reaching its determination on this issue, the Panel defied applicable law. Additionally, the Panel's apparent reliance, as indicated in the Panel's Award, Dkt. 34-3 ¶ 9 (stating that in reaching it Award, the Arbitrators "looked to for guidance . . . the rules and regulations of the FCC"), on the 2003 and 2008 FCC Rulings that such dialing systems qualify as an ATDS also constitutes a sufficient "colorable basis", *Wallace*, 378 F.3d at 193, for the Panel's conclusion that Plaintiff sustained her burden to establish the calls at issue were made by Defendant's vendors at Defendant's direction using an ATDS as found in the Award.

Dkt. 34-3 ¶ 10. Finally, the record indicates the Panel could reasonably concluded based on this record, at least colorably, that the dialing systems used by Defendant's vendors to call Plaintiff's cell number were generated by an ATDS. Specifically, Defendant's Vice-President Harwood testified that the vendor's – predictive dialer – dialing systems initiated the calls without input by a live operator, Dkt. 34-4 at 49-50 (indicating "system," not the vendor's agent-operator, determines which consumer numbers to call and places calls based on a "campaign directive") suggesting that the specific telephone numbers to be called were programmed with an automated dialing system which initiated the calls so as to coordinate the availability of the called party with the availability of an agent, based on the "algorithm or predictive whatever," Dkt. 34-4 at 49,[15] to discuss the called party's account. This evidence also reasonably supports the Panel's conclusion that Defendant's dialing systems utilized by Defendant's vendors included the capacity "to store or produce telephone numbers to be called, using a random or sequential number generator[ ] [the algorithm or software program which operates the system] and to dial such numbers." 47 U.S.C. § 227(a)(1)(A), (B); see Dkt. 34-3 (the Award) ¶ 10 ("the calls . . . were made by a system that sequentially generated telephone numbers and qualified as an [ATDS]"). Particularly, the Arbitrators could have reasonably found, based on Harwood's testimony, that Defendant provided the accounts in arrearage, together with their respective phone numbers including those captured as incoming calls with Defendant's

---

[15] The "algorithm," as Harwood testified in describing his knowledge of the vendors' systems, provided the internal directions to the computer by which the vendors' dialing systems were programmed to generate or create the "sequential number[s]" for the customer accounts to be dialed in the most efficient manner. In the computer context, an algorithm is a finite sequence of well-defined, computer-implementable instructions, typically to solve a class of problems or to perform a computation. Language of Higher Math: The Definitive Glossary of Higher Mathematical Jargon - Algorithm, *available at* https://mathvault.ca (last visited April 1, 2020).

ANI System (as without such information the vendors would have lacked such numbers), to be contacted by the vendors which data was downloaded, *i.e.*, "stored," to the vendor's computer dialing system for later automated calling through a "sequential number generator," the system's predictive dialing algorithm, resulting in the plethora of calls made by Defendant to Plaintiff's 0301 number. Finally, caselaw within the Second Circuit indicates that the high volume of the calls (471 in this case) made by Defendant's dialing system, – an undisputed fact in this case – is a relevant indicator that an ATDS was used without prior express consent in violation of the TCPA. *See Gerrard v. Acara Solutions, Inc.*, 2019 WL 2647758, at * 8 (W.D.N.Y. June 27, 2019) (observing allegations of high volume of calls can indicate use of ATDS (citing *Krady v. Eleven Salon Spa*, 2017 WL 6541443, at *4 (E.D.N.Y. July 28, 2017) (plaintiff's receipt of defendant's 36 text messages supports sufficiency of plaintiff's ATDS allegation for violation of TCPA)). Here, it is undisputed that Defendant, through its collection vendors, called Plaintiff's cell phone at least 465 times over a period of five months (December 2014 – May 2015). While this factor was not explicitly referenced in the Award by the Panel it is not unreasonable to infer that it was recognized by the Arbitrators as indicative that the disputed calls were generated by the use of a computerized automated dialing equipment, in considering whether Plaintiff had established Defendant utilized an ATDS in this case or, at a minimum, that Defendant's predictive dialing system had the capacity to function as an ATDS. *See D.H. Blair,* 462 F.3d at 110, (arbitrators not required to provide reasons for award which should be confirmed if a ground for the decision can be inferred from the record). Defendant does not contest

its vendors' dialing systems were computerized or that substantially all of the calls were automated, not individually dialed by an agent.

Defendant also relies, Dkt. 29-1 at 18-19, on *Roark v. Credit One Bank, N.A.*, 2018 WL 5921652, at *3 (D.Minn. Nov. 13, 2018), *appeal dismissed*, 2019 WL 2447062 (8th Cir. 2019), in which the court found for defendant on plaintiff's TCPA claim based on plaintiff's failure to establish on summary judgment that defendant's service vendors used an ATDS to contact plaintiff without express prior consent. Defendant's reliance is unavailing. First, *Roark* is not a decision of the Second Circuit which could serve as a basis to vacate an arbitration award based on the manifest disregard of law doctrine upon which Defendant basically relies to vacate the Award. Second, in contrast to the sparse record in *Roark* on the actual functional capabilities of defendant's system in that case, *see Roark*, 2018 WL 5921652, at *3, testimony in this case provided by Defendant's Vice President Harwood, in support of a finding Defendant's vendors used a predictive dialer system that also qualified under the 2003 and 2008 FCC Rulings as an ATDS, indicated Defendant's systems did in fact have the present capacity to generate telephone numbers of those of credit card holders whose accounts were in arrears, in a sequence determined by the system, not the collections agency, and did call such numbers. Dkt. 34-4 at 49 (vendor's systems do not select numbers to call randomly "but [as Harwood explained] according to whatever recognition or predictive whatever, it will dial a number and connect the agent to that number"). Nor, contrary to caselaw in this circuit, *see Krady*, 2017 WL 6541443, at *4, did the court in *Roark* recognize the numerosity of the calls at issue – 140 over a 90-day period – as evidence of calls made by an ATDS. Third, the court in *Roark* addressed the merits of

defendant's summary judgment in a judicial action to enforce the TCPA, not based on the limited scope of judicial review to be accorded an arbitration award required of a court pursuant to the FAA and under the Second Circuit's manifest disregard of law doctrine. Thus, there is, contrary to Defendant's arguments to vacate the Award based on the Arbitrators' manifest disregard of clearly applicable Second Circuit caselaw, no ground to vacate the Award.

2.    Defendant's Motion to Seal.

As noted, Background, *supra*, at 4, Defendant moved to seal copies of certain documents, including redacted versions thereof, pertaining to the underlying arbitration proceeding particularly Easley Declaration Exhibits 1, 3, 4, 6, 7, and 8 (Dkt. 29-2). As noted, Background, *supra*, at 4, Exhibit 1 is the Arbitrator's Award dated September 21, 2018, which Defendant seeks to vacate; Exhibit 3 is a copy of the transcript of the evidentiary hearing conducted before the Panel on June 26, 2018; Exhibit 4 is a copy of Defendant's pre-hearing Arbitration Brief; Exhibit 6 is a copy of the Defendant's call log reflecting calls received, *i.e.*, inbound, by Defendant that were placed from Plaintiff's 0301 cell number submitted as evidence to the Arbitrators; Exhibit 7 is a copy of Defendant's Post-Arbitration Brief filed with the Panel on August 15, 2018; and Exhibit 8 is a copy of Defendant's Post-Arbitration Reply, dated August 28, 2018, submitted to the Arbitration Panel ("the Arbitration Materials").[16] Defendant contends all of these materials constitute confidential information, including personal identification facts such as the name of Plaintiff's male companion, which, Defendant asserts, is considered confidential under the American Arbitration Association's Consumer Due Process

---

[16] Defendant did not comply with Local Rule of Civil Procedure 5.3 to obtain the required prior court approval to file the Arbitration Materials under seal.

Protocol Statement of Principles No. 12(2) ("AAA Protocol" or "Protocol"). Dkt. 41 at 2. The AAA Protocol states arbitrators shall make reasonable efforts to "maintain the privacy of the [arbitration] hearing" . . . and should "consider claims of privilege and confidentiality when addressing evidentiary." Defendant asserts that because the parties and Arbitrators conducted the arbitration hearing in accordance with the AAA Protocol and the expectation of privacy stated therein, the Arbitration Materials should not be filed with the court as publicly accessible documents. Dkt. 42 at 2. Defendant also asserts the Arbitration Materials include discussions between the parties and the arbitrators, confidential information regarding Defendant's internal, non-public, business practices, and testimony by non-party witnesses such as Plaintiff's male companion. *Id.* In support of Defendant's motion to seal, Defendant contends only documents relevant to the performance of the court's judicial function are subject to public access. Dkt. 41 at 2-3 (citing *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (citing *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995)).

In Plaintiff's opposition to Defendant's Motion to Seal, Plaintiff argues that Fed.R.Civ.P. 5.2 ("Rule 5.2") requires redaction or sealing of documents submitted for filing with the court limited to the last four digits of a person's Social Security number or other personal accounts and date of birth. Dkt. 36 at 1. Plaintiff also maintains the AAA Protocol requires no subsequent redaction or sealing of materials submitted to arbitrators in connection with the underlying arbitration proceeding nor does the Protocol purport to extend it requirements to further judicial proceedings to confirm or vacate an award pursuant to FAA. *Id.* (citing *Bolia v. Mercury Print Prods., Inc.*, 2004 WL 2526407, at *3 (W.D.N.Y. Oct. 28, 2004) ("Judicial documents . . . are presumptively

accessible to the public") (granting in part and denying in part defendant's motion to seal)).

Although in some instances material submitted to a federal court may be sealed thereby prohibiting public access, the public's "right to access" to "'judicial documents,'" including material submitted during the course of private arbitration proceedings, to enable oversight of judicial proceedings to promote public confidence in the "administration of justice'" is "well-established." *Century Indem. Co. v. AXA Belgium*, 2012 WL 4354816, at *13 (S.D.N.Y. Sept. 24, 2012) ("*Century Indem.*") (quoting *Lugosch*, 435 F.3d at 119) (further internal quotation marks and citations omitted)). "'In order to be designated a judicial document, the item filed must be relevant to the performance of the judicial function and useful in the judicial process.'" *Id.* (quoting *Lugosch*, 435 F.3d at 119 (quoting *United States v. Amodeo*, 44 F.3d 141, 165 (2d Cir. 1995))). If the disputed document is a "judicial document" the court must also consider the weight of the presumption of public access to documents at issue. *Lugosch*, 435 F.3d at 145 (quoting *United States v. Amodeo*, 71 F.3d 1044, 10149 (2d Cir. 1995)). In doing so the court considers "'the role of the materials at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.'" *Century Indem. Co.*, 2012 WL 4354816, at *13 (quoting *Lugosch*, 435 F.3d at 119) (quoting *Amodeo*, 71 F.3d at 1049))). In rejecting the parties' request to seal, the court in *Century Indemnity*, found that the petition pursuant to the FAA to confirm an arbitration award, legal memoranda, other supporting documents filed in support of the request to confirm the award, including the final award, were judicial documents entitled to public access. *Id.* (finding such materials are "indisputably judicial

documents," subject to public access) (citing cases)). In the instant case, as regards the public's potential interest in the Arbitration Materials, how the courts act with respect to enforcement of the TCPA, a significant federal consumer protection and remedial statute, and, to some extent, the burdens it may impose upon the business sector to achieve and maintain compliance, are fair subjects for public awareness and scrutiny. Finally, Defendant offers no additional considerations arguing against public access and disclosure in this case. More specifically, while Defendant relies on the AAA Protocol, the Protocol does not by its terms purport to apply to subsequent proceedings to confirm or vacate an award under the FAA, and Defendant points to no provisions of the Cardholder and Arbitration Agreement or caselaw which requires such materials to be and remain confidential. *See Century Indem. Co.*, 2012 WL 4354816, at *14 (holding the parties' private confidentiality agreement covering the Arbitration Information Materials sought to be sealed binding on the parties but not the court) (citing and quoting *Global Reinsurance Corp.-U.S. Branch v. Argonaut Ins. Co.*, 2008 WL 1805459, at *1 (S.D.N.Y. Apr. 21, 2008) ("while parties to an arbitration are generally 'permitted to keep their private undertakings from the prying eyes of others,'" "the 'circumstance changes when a party seeks to enforce in federal court the fruits of their private agreement to arbitrate, *i.e.*, the arbitration award.'")). Moreover, Plaintiff has revealed the identity of Plaintiff's male companion in Plaintiff's papers filed in opposition to Defendant's motions to vacate and seal, which were not filed under seal or with redactions, nor did Defendant move to strike Plaintiff's filing for this reason, *see, e.g.*, Dkt. 35 at 1 ("Plaintiff's Notice of Cross-Motion") ("The call [to Defendant from Plaintiff's 0301 number] was associated with an account in the name of Justin Kroll, Plaintiff's

boyfriend at the time."), and the need, if any, for his identity to remain undisclosed is therefore now effectively moot. As to Defendant's alleged internal operations such as the dialing systems used by its vendors for out-going calls to cardholders and record keeping of incoming calls in Defendant's ANI system, Defendant has provided no affidavit of a person with actual knowledge of the facts supporting that any of such information was of a propriety nature subject to judicial protection. *See DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 827 (2d Cir. 1997) (affirming district court's sealing of arbitration file where defendant met its burden of establishing through letters from defendants representatives the plaintiff, who opposed sealing, obtained only from defendant documents that were never intended to be made public). Moreover, any witness's Social Security and credit card account numbers have been reduced to their last four digits as required by Rule 5.2. In sum, the Arbitration Materials are judicial documents subject to the presumption of public access and Defendant has failed to demonstrate any factors which outweigh the presumption. *See Global Reinsurance Corp.-U.S. Branch*, 2008 WL 1805459, at *1 (party seeking to seal arbitration-related document "must demonstrate why presumption of access should be overcome") (citing *Lugosch*, 435 F.3d at 119-20)). Based on Defendant's submissions, the court therefore does not find any of the sealed Arbitration Materials contain any "subject matter[...] traditionally considered private rather than public." *Bolia*, 2004 WL 2526407, at *3. As such, Defendant's Motion to Seal (Dkt. 30) is DENIED.

3.    Pre-Judgment and Post-Award Interest.

In Plaintiff' motion filed January 11, 2019 (Dkt. 35), in addition to granting Plaintiff's motion to confirm the Arbitration Award, Plaintiff requests the court to award

prejudgment, *i.e.*, post-award, interest, Dkt. 35-1 at 2, 7, at the rate of 7% pursuant to Nevada law retroactive to June 11, 2015. Defendant opposes Plaintiff's motion arguing primarily that as Plaintiff failed to request such an award of interest from the Arbitration Panel and failed to timely, within 90 days, as required by the FAA § 10, request the court to modify the Award to include interest, Plaintiff is now foreclosed from doing so. Dkt. 40 at 3-4. It is basic that in an arbitration case "pre-award interest is a matter left within an arbitrator's discretion, [however] 'post-award pre[-]judgment interest is a matter left with the district court.'" *Maersk Line Limited v. Nat'l Air Cargo Grp., Inc.*, 2017 WL 4444941, at *3 (S.D.N.Y. Oct. 4, 2017) (quoting *Moran v. Arcano*, 1990 WL 113121, at * 3 (S.D.N.Y. July 27, 1990)). Further, if the arbitration award fails to award pre-award interest, a district court is without authority to do so. *See Sayigh v. Pier 59 Studios, L.P.*, 2015 WL 997692, at *13 (S.D.N.Y. Mar. 5, 2015) (quoting *In re Grubere*, 531 N.Y.S.2d 557 (Aug. 11, 1988)). Here, the record indicates Plaintiff neither requested pre-award interest from the Arbitrators, nor did the Panel award such interest. Thus, Plaintiff is not entitled to, and does not request, pre-award interest.

As to Plaintiff's request for post-award pre-judgment interest, such interest "is generally awarded at the discretion of the district court, and there is a presumption in favor of awarding such 'interest.'" *Maersk Line Limited*, 2017 WL 4444941, at *4 (quoting *In re Arbitration Between Westchester Fire Ins. Co. v. Massamont Ins. Agency, Inc.*, 420 F.Supp.2d 223, 226-27 (S.D.N.Y. 2005) (citing *In re Waterside Ocean Navigation Co. v. Int'l Navigation, Ltd.*, 737 F.2d 150, 153-54 (2d Cir. 1984); *Irving R. Boody & Co. v. Win Hldgs Int'l, Inc.*, 213 F.Supp.2d 378, 383 (S.D.N.Y. 2002))). Here, Plaintiff points to paragraph 29 of the Cardholder and Arbitration Agreement, Dkt. 35-1

at 6 (referencing Dkt. 34-6 ¶ 29) which provides that the Agreement is governed by "laws applicable to national banks and, where no such laws apply, by the laws of the State of Nevada, . . . regardless of your [Plaintiff] state of residence." According to Plaintiff, the applicable interest rate under Nevada law is 7%, an assertion not disputed by Defendant (Dkt. 40) (*passim*). *See Sayigh*, 2015 WL 997692, at *13 (under arbitration agreement New York's 9% interest is applicable to plaintiff's request for post-award pre-judgment interest). Defendant's opposition is based on an attempt to distinguish Plaintiff's caselaw, *see* Dkt. 40 at 4, however, Defendant's failure to rebut the basic legal principles applicable, as described above, to whether the court should award post-award pre-judgment interest in this case, as Plaintiff requests, dilutes Defendant's opposition. Moreover, Defendant points to no law applicable to a national bank like Defendant as relevant to this issue that requires a different result on Plaintiff's motion. In deciding to award such pre-judgment interest, courts consider whether to do so "would be 'fair, equitable and necessary to compensate the wronged party fully.'" *Maersk Line Limited*, 2017 WL 4444941, at *4 (quoting *Wickham Contracting Co. v. Local Union No. 3, Int'l Bhd. Of Elec. Workers, AFL-CIO*, 955 F.2d 831, 835 (2d Cir. 1992) (collecting cases)). Notwithstanding the relatively modest rate of inflation during recent years, the court finds Plaintiff's proposed 7% interest rate applicable under Nevada law, to be a fair and reasonable interest rate necessary to fully compensate Plaintiff based on the Award. Accordingly, Plaintiff's motion for post-award prejudgment interest (Dkt. 35) at the rate of 7% should be granted and added to the Award commencing 30 days after the date of the Award, in this case, September 21, 2018, to the date judgment confirming the Award is entered in this case.

## CONCLUSION

Based on the foregoing, Defendant's motion to Vacate the Arbitration Award (Dkt. 29) should be DENIED; Plaintiff's Cross-Motion to Confirm the Award (Dkt. 35) should be GRANTED and the action DISMISSED as moot; Plaintiff's Cross-Motion for Judgment on the Pleadings (Dkt. 35) is DISMISSED as redundant; Defendant's Motion to Seal (Dkt. 30) is DENIED; Plaintiff's Motion for Post-Award Pre-Judgment Interest (Dkt. 35) should be GRANTED; the Clerk of Court should be directed to enter judgment in favor of Plaintiff upon the Award, plus pre-judgment interest as recommended herein, and to close the case.

Respectfully submitted,

/s/ *Leslie G. Foschio*

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

SO ORDERED as to
Defendant's Motion to Stay (Dkt. 9);
Defendant's Motion to Seal (Dkt. 30)
and Plaintiff's Cross-Motion for
Judgment on the Pleadings(Dkt. 35).

/s/ *Leslie G. Foschio*

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Dated:  March 31, 2020
        Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72(b).

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>**

*Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     March 31, 2020
           Buffalo, New York