UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KIMBERLY SALERNO,

                         Plaintiffs,

        v.                                       Civil Action No. 1:15-cv-0516-LJV

CREDIT ONE BANK, N.A.,

                         Defendant.
_____

## PLAINTIFF'S RESPONSE TO DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION OF THE MAGIS TRATE JUDGE

### I.       PROCEDURAL HISTORY

Plaintiff filed this action against Defendant under the Telephone Consumer Protection Act, (TCPA), 47 U.S.C. 227(b).  This Court stayed the action and referred it to arbitration pursuant to the terms of the parties credit card agreement. (Dkt. 21).

Pursuant to the parties credit card agreement, an arbitration proceeding was held before a single arbitrator, who found that the Defendant had made 466 ATDS calls to Plaintiff without her express consent.  Accordingly, he awarded Plaintiff $500.00 per call, or $233,000.00. (Exh. 35-4).

Pursuant to the provisions of the parties arbitration agreement, Defendant appealed that determination and a second arbitration before a three-member arbitration panel.  The panel found that Defendant had made 465 ATDS calls to Plaintiff without her express consent and as such, awarded her $232,500.00. (Dkt. 35-5).

Defendant filed a Motion to Vacate the Arbitration Award, and Plaintiff filed a Cross-Motion to Confirm the Award.[1]  On March 31, 2020, Magistrate Judge Leslie G. Foschio issued a Report and Recommendation ("the Report") that Defendant's Motion be denied, and that Plaintiff's Motion be granted.  The Report also recommends the granting of post-arbitration award interest at 7%.  The report was entered on April 1, 2020.

Defendant filed Objections to the Report on April 15, 2020.  Plaintiff files this Memorandum of Law in response to Defendant's Objections to the Report and Recommendation of Magistrate Judge Leslie G. Foschio entered on April 1, 2020.

In addition to the arguments contained herein, the Plaintiff incorporates by reference the arguments made in her briefs filed in proceedings before the Magistrate Judge, and the well-reasoned findings of the Magistrate Judge.

## II.    FACTS

Kimberly Salerno applied online for a Credit One credit card in 2012.  At the time, she did not own a cell phone, so she listed her landline number (ending in 3439) on her application. She put down her landline, with the last four numbers of 3439.  *See* Hearing Transcript (annexed as Exh. 3, at Dkt. 29-2) of proceedings before Arbitration Panel (hereinafter "Tr.") Tr. 45-47.  The account was only in her name.  Her boyfriend, Justin Kroll, also had an account with Credit One.  However, he was not on her account.  He had his own Credit One account.  Tr. 47.  In April of 2014, Ms. Salerno obtained a cellular phone with a number with the last four numbers of 0301. Tr. 45-47; 51.  She did not provide that cellular phone number to Credit One at any time.  Tr. 51.

---

[1] Dkt No. 34 does not appear on the docket sheet of the Court.  It is unclear why this docket entry was apparently stricken from the docket, and substituted with Docket No. 35, which does not contain all of the exhibits attached to Dkt 34..  It is possible that the Court did this sua sponte in light of Defendant's Motion to Seal, but no order was ever entered directing Dkt No 34 be sealed.

She did not provide anything in writing or otherwise to Credit One authorizing them to contact her at this number.  Tr. 51.  Defendant has incorrectly asserted that Plaintiff provided her cellular telephone number Credit One, and that she consented to receive ATDS calls.  The evidence on this issue is as follows.

There were two agreements that Credit One claims evidenced Plaintiff's consent to receive ATDS calls.  The first was the so-called "stripped-down" agreement allegedly provided at the time she applied, and the formal credit card agreement she allegedly agreed to after she was approved for credit. Tr. 147. (See Exh. 3).

The stripped-down agreement stated in relevant part:

**COMMUNICATIONS:** I give the Bank and its agents express permission to contact me at the phone numbers (including cell phone) . . . the Bank may contact me through a live operator, automatic telephone dialing systems, prerecorded message, text message or email. . .

(Dkt. 34-3).

This provision clearly did not give Credit One permission to call Plaintiff with an ATDS.[2]  At the time of her application, Plaintiff did not own a cell phone and, as such, only provided Credit One with a landline number. Tr. 47.  Second, she unambiguously testified that she *never* provided Credit One with her cell number:

The second agreement was the formal credit card agreement allegedly provided to the Plaintiff with her credit card. (Exh. 5).  This communication provisions of this agreement was more expansive than the stripped-down agreement.  This agreement stated:

19. COMMUNICATIONS: You expressly authorize Credit One Bank or its agents to contact you at any phone number (including mobile, cellular/wireless, or similar devices) or email address you provide at anytime, for any lawful purpose. The ways in which we may contact you include live operator, automatic

---

[2] This clause did not contain the provision contained in the agreement subsequently mailed to Plaintiff indicating that merely calling Credit One would be deemed a consent to call the number called from.

telephone dialing systems (auto-dialer), prerecorded message, text message or
email. Phone numbers and email addresses you provide include those you give to
us, those from which you contact us or which we obtain through other means.
Such lawful purposes include, but are not limited to: obtaining information;
account transactions or servicing related matters; suspected fraud or identity
theft; collection on the Account; and providing information about special
products and services. You agree to pay any fee(s) or charge(s) that you may
incur for incoming communications from us or outgoing communications to us,
to or from any such number or email address, without
reimbursement from.

For the following reasons, the Arbitration Panel had, at minimum, a colorable

basis to find that the above provisions did not give Credit One express consent to call

Plaintiff's cell phone using ATDS technology.

On October 23, 2014 an inbound call to Credit Bank was received from a cell phone

number ending in 0301 (Salerno's cell phone at issue).  The call was associated with an account

in the name of Justin Kroll, Plaintiff's boyfriend at the time.  *See* Tr. 121-122.  According to Credit

One's corporate representative, Gary Harwood, the 0301 number was associated through an

automated process not involving a live agent, and required the caller to provide Kroll's social

security number and account number.  *See* Tr. 122-123.  The Bank then captured the 0301 number

and associated it with Mr. Kroll's account, without any prompt to identify the caller.  *Id*.

Ms. Salerno does not recall making any call to Credit One on October 23, 2014.  She did

not recall if Justin Kroll used her phone on that day, but it was possible.  It was also possible that

she helped Justin access his account and that he relayed the information to her while she placed

the call.  However, he would not normally give her his personal information.  That would

"absolutely" be "very unusual."  Tr. 55.  There was no chance or possibility that she made the

call without Justin being present.  Tr. 56.  Mr. Harwood admitted that this manner of obtaining

purported consent allowed for the possibility that someone could borrow a phone to check their

account, and that the person who lent the phone could have unwittingly had their number associated with the account.

By reason of the above, it is submitted that the Defendant has not met their burden of proving that Plaintiff provided the 0301 number.  At best, there is a conflict in the evidence as to whether she did so which was clearly within the province of the arbitrators to resolve.  The arbitration panel specifically found that Ms. Salerno did not consent. (See finding number 11). *See* Tr. 135-136. *Westerbeke Corp. v. Daihatsu Motor Co.,* 304 F.3d 200, 213 (2d Cir. 2002) (*citing  Wonderland Greyhound Park, Inc. v. Autotote Sys., Inc.,* 274 F.3d 34, 36–37 (1st Cir.2001) ("An arbitrator's factual findings are generally not open to judicial challenge, and we accept the facts as the arbitrator found them." (quotations marks and citations omitted)); *ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., Inc.,* 102 F.3d 677, 687 (2d Cir.1996) (holding that an erroneous factual determination is not a ground for vacating an arbitration award).

At some point Mr. Kroll's account was referred by Credit One to third party vendors for collection.  See Tr. 126.  The specific third party vendors who worked his account were TP USA, First Contact, and iEnergizer.  Tr. 127.  The Defendant has conceded in their objections that the calls were made using an ATDS as defined in the TCPA. (Def. Objections, at p. 3, fn. 2).

From December of 2014 through May of 2015, Defendant's own records indicate that 471 calls were placed by Defendant to Plaintiff's number ending in 0301. Dkt. 34, Pl's Ex. 1, COB#57-73; see also Tr. 51, 128.[3] Out of these calls, only three were placed to Plaintiff regarding her own

---

[3]  There is some confusion regarding the exact number of calls. At the hearing, without access to the account records, Mr. Harwood testified there were 474 calls. Tr. 121.  However, Credit One's documents established that there were 471 calls.  All but three of those were made in an attempt to contact Mr. Kroll.  The three calls made regarding Plaintiff's account, and two of the calls made to Mr. Kroll were made manually.  That leaves 466 actionable calls.  However, the Arbitration Panel found Credit One liable for only 465 calls.

Credit One account. See Dkt 34, Pl's Ex. 1, COB#57-73; see also Tr. 129.  All of the vendors used software which Credit One provided so that Credit One could "see what's transpiring on the accounts at all times."  Tr. 129.

Credit One admitted that it will continue to call a customer until the customer tells them to stop, and will always assume that the customer wants to continue receiving calls until they explicitly say stop.  If Credit One were to call a customer 50,000 times with no answer , they would presume the customer wants to receive the 50,001st call unless the customer had said stop.  Tr. 205.

## III.   ARGUMENT

### A. *Reyes* Is Distinguished From This Case

The Defendant argues that the arbitral panel and the Magistrate Judge erred by allegedly ignoring the holding in the *Reyes* case. *Reyes v. Lincoln Automotive Financial Servs.,* 861 F.3d 51 (2d Cir. 2017).  Specifically, they argue that the panel and the Magistrate Judge ignored the terms of the contract entered into by Plaintiff and the Defendant in which, they assert, Plaintiff gave consent to receive ATDS calls.  However, *Reyes* is distinguished from this case.

In *Reyes,* the narrow issue considered by the Court was whether a person who had agreed in the terms of a bargained-for, bilateral contract to receive ATDS calls could revoke that consent.  The parties in *Reyes* had entered into an automobile finance agreement, which provided that the defendant could make ATDS calls to the plaintiff.  The *Reyes* Court held that consent to receive ATDS calls in that context could not be revoked except by agreement of the parties. *Id.*

In contrast, in this case, at the time Plaintiff applied for her credit card, she did not provide consent to be called by an ATDS.  After applying for the credit card, she was sent contractual terms that contained an authorization to receive ATDS calls regarding her account.  After receiving those terms, Plaintiff used the credit card, which by law, was an acceptance of those terms.  Thus,

her consent was not the product of a bargained-for bilateral agreement.  Rather, her consent was provided unilaterally through Plaintiff's acceptance, manifested by implication through her use of her credit card.

The facts in this case are similar to the facts of *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265 (3d Cir. 2013) and *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014), both of which involved credit arrangements similar to the arrangements in this case, to wit:  an application for credit in which consent to receive ATDS calls were given, followed by a later agreement to receive those calls evidenced by the use of the account.  In *Reyes,* the Court specifically distinguished those cases noting that in those cases, the consent was unilaterally given. *Reyes,* at *56.

The Defendant argues that the credit card agreement entered into by the parties was not unilateral.  However, this is incorrect.  In *Bank of America v. Jarczyk,* 268 B.R. 17 (W.D.N.Y. 2001), Judge Arcara examined this issue:

> According to the bankruptcy court, the use of a credit card "suggests only a representation that the user possesses good credit sufficient to allow either the advance of funds or the purchase of goods or services." Bankruptcy Court Order, at 9. It says nothing of the user's intent to pay. *Id.* The bankruptcy court determined that representations about the intent (or ability) to pay are made, if at all, at the time that a credit card application is made. *Id.* at 10.
>
> Underlying the bankruptcy court's analysis appears to be the notion that issuance of the credit card forms a contract between the credit card issuer and the cardholder. Therefore, in the bankruptcy court's view, representations as to performance on the contract were made, if at all, at the time the card was issued and the contract was formed.
>
> However, the mere issuance of a credit card does not create a binding contract between the card issuer and the cardholder. Instead, the issuance of a credit card is simply an *offer* to a series of unilateral contracts. Until that offer is accepted by the cardholder, by using his credit card, no contract has been formed. As explained in one learned treatise:

> The issuance of a credit card is but one offer to extend a line of open account credit. It is unilateral and supported by no consideration. The offer may be withdrawn at any time, without prior notice, for any reason, or, indeed, for no reason at all, and its withdrawal breaches no duty—for there is no duty to continue it -and violates no rights. Acceptance or use of the card by the offeree makes a contract between the parties according to the terms....
>
> *Id.* at § 2.33 (quoting *City Stores v. Henderson,* 116 Ga.App. 114, 156 S.E.2d 818 (1967)). Because it is the *use* of the credit card, and not the *issuance,* that creates an enforceable contract, each time a cardholder uses his credit card, he accepts the offer by tendering his promise to perform (i.e. to repay the debt upon the terms set forth in the credit card agreement). *See* Corbin on Contracts, Revised Ed., § 1.23 (promisor to a unilateral contract can either be an offeror or an offeree).

*Bank of America v. Jarczyk,* 268 B.R. 17, 22 (W.D.N.Y. 2001).

*Reyes* is also distinguished from the instant case because the consent given by Plaintiff was implied, not express. Plaintiff's assent to the terms of the cardholder agreement was *implied by her conduct* (i.e. through her use of the credit card), not express assent, as would be the case where an individual signs an agreement. *See Propet USA, Inc. v. Shugart,* 2007 WL 2743191, at *2-3 (W.D. Wash.2007) (characterizing assent through use of opening of shrink wrap agreement "implied assent," and finding "express assent" unnecessary to form a contract.); *Aymett v. Citibank S. Dakota N.A.,* 397 S.W.3d 876, 878 (Tex. App. 2013) (An agreement to the amount owed can be implied from proof that . . . the defendant made charges and payments on the account . . ."); *Weldon v. Asset Acceptance, L.L.C.,* 896 N.E.2d 1181, 1187 (Ind.Ct.App.2008) (noting that although debtor's signature does not appear on written credit card agreement, his assent to the terms of the agreement was implied from his conduct of using credit card); *Wagner v. Discover Bank,* 2014 WL 128371, at 2-3 (D. Colo.2014) (finding implied assent to cardmember agreement through use of credit card).

The fact that Plaintiff's agreement was implied, as opposed to express, is critical to the outcome of this case.  The TCPA prohibits calls to a person using an ATDS unless that person has

given *express* consent to be called. 47 U.S.C.§227(b)(1)(A)(iii).  However, as outlined above, any agreement that the Plaintiff's may have made to consent to ATDS calls was implied through her conduct, not expressly agreed upon.  As such, there is no evidence that Plaintiff provided express consent to be called on her cellular telephone. (See Plaintiff's Memorandum of Law, at pgs. 9-10; Report, at pgs. 15-16 for more thorough analysis).

When Plaintiff entered into the credit card agreement with Credit One, she did not yet possess the cell phone account that they ultimately called using an ATDS.  Any agreement that Plaintiff may have given to receive ATDS calls was, thus, not given at the time the credit was extended to her.  The Second Circuit has not definitely decided whether the provision of a cell phone number "as part of a continuing transaction" constitutes prior express consent. *See Nigro v. Mercantile Adjustment Bureau, LLC,* 769 F.3d 804, 806 (2d Cir. 2019) declining to reach that issue.  As such, given the lack of legal precedent in this circuit finding that providing a cell phone number under those circumstance can be considered express consent, the arbitral panel was not a manifest error of law. (See Report, fn. 11).

All but three of the 469 ATDS calls made to Plaintiff's cell phone were made in an attempt to contact Justin Kroll regarding his account with Credit One. Dkt. 34-5 at 5, ¶ 19; Tr. 128-129. Even if one assumes, *arguendo*, that the Plaintiff expressly consented to be called by an ATDS in her agreement, her consent was clearly limited to calls regarding *her* account.  The agreement states that "we may contact **you**."  It did not state that they could contact Justin Kroll at her telephone number.  She never agreed to be called regarding Justin Kroll's account.  In fact, the Defendant was not even attempting to speak with the Plaintiff when they called her cellular telephone; they were calling in the hope of speaking with Justin Kroll.

The mere disagreement by a court with an arbitrator's assessment of the evidence in support of an award is an insufficient basis upon which to vacate an award under the manifest error of law doctrine. *Wallace v. Buttar,* 378 F.3d 182, 192-193 (2d Cir. 2004) (citing *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.,* 304 F.3d 200, 212 n.12 (2nd Cir. 2002). The record indicates that 466 ATDS call were made to Plaintiff's cell phone in an attempt to contact Justin Kroll. Since she never gave consent, express or otherwise, to receive calls to her cell phone regarding Justin Kroll's account, the Arbitration Panel's finding that Credit One is liable for 465 ATDS calls is supported by the record, and certainly not a manifest error, supported by the record. See Report, at pgs. 15-16.

The Defendant argues that it was lawful for them to call Plaintiff, and that the agreement stated they could call her for any lawful purpose. However, that argument begs the question of whether they had express consent to call her. Since they did not have express consent, under the TCPA, the call was not lawful.

The Defendant complains that the law as stated in the Report would set a dangerous precedent because credit card companies and consumers would then be unable to agree to terms in a contract, such as an agreement to make and receive calls using an ATDS. But, in fact, there is no such dangerous precedent. In this case, Plaintiff never agreed, and no reasonable consumer would agree to be called on someone else's account. Credit One was placing calls to Justin Kroll, not Plaintiff. In addition, there would be no reason why they could not simply insist on a signed, bilateral contract establishing consent to make and received ATDS calls.

The statute requires express consent. Credit One may feel aggrieved because they could not robocall Plaintiff's phone in an attempt to contact Justin Kroll. But Congress enacted the TCPA to address the serious plague of unwanted robocalls, the number one complaint of

consumers in this country.  Congress mandated that any consent be express.  If Credit One wants

to make robocalls, they need to comply with the TCPA.  They did not do so in this case.

### B.  DEFENDANT HAS WAIVED ANY ARGUMENT THAT THE TCPA IS UNCONSTITUTIONAL

In their objections to the Report, the Defendant, for the first time, argues that the TCPA

is, in effect, unconstitutional.  Their claim is that a provision of the TCPA that creates an

exception to liability for ATDS calls made to collect a government-backed debt, such as a

student loan, is an unconstitutional restraint on free speech in violation of the First Amendment.

They further argue that the proper remedy to address this provision is not to simply sever the

allegedly offensive provision, but rather, to strike down the entire TCPA.  The merits of this

claim will be address in a subsequent section of this brief.

The Defendant never made an argument that the TCPA should be struck down due to the

allegedly unconstitutional provisions of the statute in arbitration proceedings, or proceedings

before the Magistrate Judge in connection with their Motion to Vacate the Arbitration Award.

In general, arguments not made in arbitration are waived in subsequent court proceeding

to confirm or vacate the award. *Trustees of New York State Nurses Ass'n Pension Plan v. Cabrini

Med. Ctr.*, 2009 WL 10713121, at *5 (S.D.N.Y. 2009); *Am. Nursing Home v. Local 144 Hotel

Hosp., Nursing Home & Allied Servs. Union,* No., 1992 WL 47553, at *4 (S.D.N.Y.1992)

("Failure to raise an issue in an arbitration proceeding waives the issue in a confirmation or

enforcement proceeding.").

Likewise, a district court will generally not consider arguments that were not raised

before the magistrate judge." *Diaz v. Portfolio Recovery Associates, LLC,* 2012 WL 1882976, at

* 2 (E.D.N.Y. 2012). *See Murr v. United States,* 200 F.3d 895, 902 n. 1 (6th Cir.2000) ("Courts

have held that while the Magistrate Judge Act, 28 U.S.C. § 631 *et seq.,* permits *de novo* review

by the district court if timely objections are filed, absent compelling reasons, it does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate."); *Zhao v. State University of New York,* No. 04 Civ. 0210, 2011 WL 3610717, at *1 (E.D.N.Y. 2011) (" 'In this district and circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.' ") (quoting *Illis v. Artus,* 2009 WL 2730870, at *2 (E.D.N.Y. 2009)). Rather, "[i]ssues not raised before the Magistrate Judge, and therefore not addressed by [him], may not properly be deemed 'objections' to the Recommended Ruling." *Burden v. Astrue,* 588 F.Supp.2d 269, 279 (D.Conn.2008). If a district court were to consider these untimely arguments, "it would unduly undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Recommended Ruling has issued to advance additional arguments." *Id.*

For these reasons, it is respectfully submitted that this Court should find that the Defendant waived this argument.

### C.  THE DEFENDANT'S CLAIM THAT THE TCPA SHOULD BE STRICKEN BECAUSE ONE PROVISION OF IT IS UNCONSTITUTIONAL LACKS MERIT

#### 1.  The Restriction is not content-based.  Therefore, an intermediate level of scrutiny is appropriate.

The Defendant argues that the exception in the TCPA for the collection of government-backed debts is a content-based speech restriction that violates the free speech protections of the First Amendment.  This argument lacks merit for several reasons.

The Defendant explains the perceived problem with the government-backed restriction as follows: "a private debt collection agency may call the same consumer twice in a row, once to collect a private, government-guaranteed loan and once to collect a similar private loan not

guaranteed by the government, but, absent prior express consent, may place only the first call using an autodialer or prerecorded voice." (Def. Brief, at p. 14).  That is true.  However, the different legal status of a debt collector making calls seeking payment for government-backed debt as opposed to purely private debts is not based upon any particular speech uttered by the caller.  Rather, the differentiation in the treatment of these two types of debt is due to the nature of the underlying obligation, i.e. government versus private.

The government-debt exception is "justified without reference to the content of the regulated speech." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (citation omitted). The President proposed and Congress enacted the exception to "ensure that all debt owed to the United States is collected as quickly and efficiently as possible." Office of Mgmt. & Budget (OMB), Exec. Office of the President, Fiscal Year 2016: Analytical Perspectives of the U.S. Government 128 (201, https://go.usa.gov/xUtw2.OMB Report 128. The President and Congress thus identified a particular economic *activity* and authorized it to be conducted more cost-effectively through the use of automated telephone equipment. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (recognizing that "restrictions on protected expression are distinct from restrictions on economic activity"). Because the government-debt exception does not "target [calls] based on [their] communicative content," *Reed*, 135 S. Ct. at 2226—much less "raise the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace," *Turner Broad. Sys., Inc. v. FCC,*, 512 622, 641 (brackets and citation omitted)—the exception is content-neutral.

### 2.   Even if the speech being regulated is content-based, the exception survives either intermediate or strict scrutiny

Because the government-debt exception is content neutral, it should be upheld so long as it satisfies intermediate scrutiny. *See Reed*, 135 S. Ct. at 2232 ("Laws that are content neutral are

* * * subject to lesser scrutiny."). If it were not, a strict scrutiny standard applies. *Id.* Regardless of the standard of review applied, the exception should be upheld.

For nearly 30 years, the TCPA has generally prohibited the use of an automatic telephone dialing system or an artificial or prerecorded voice to call a cell phone. 47 U.S.C. 227(b)(1)(A)(iii) (Supp. V 2017). That basic automated-call restriction is clearly constitutional. It regulates the manner of speech, not the content of it. See Senate Report 4 (describing the TCPA as "an example of a reasonable time, place, and manner restriction on speech"). And it does so in furtherance of a significant—indeed, compelling—government interest: the protection of individual privacy from intrusive and disruptive calls. TCPA § 2(12), 105 Stat. 2394-2395. Every court that has considered the question has upheld the basic automated-call restriction against First Amendment challenge. See, e.g., Gomez v. CampbellEwald Co., 768 F.3d 871, 876-877 (9th Cir. 2014), aff'd on other grounds, 136 S. Ct. 663 (2016); Moser v. FCC, 46 F.3d 970, 975 (9th Cir.), cert. denied, 515 U.S. 1161 (1995); Wreyford v. Citizens for Transp. Mobility, Inc., 15 957 F. Supp. 2d 1378, 1380-1382 (N.D. Ga. 2013); cf. Patriotic Veterans, Inc. v. Zoeller, 845 F.3d 303, 306 (7th Cir.) (upholding Indiana's anti-robocall statute on the ground that "[p]reventing automated messages to persons who don't want their peace and quiet disturbed is a valid time, place, and manner restriction"), cert. denied, 137 S. Ct. 2321 (2017).

Unlike other automated calls, calls to collect government-backed debts serve a significant public and governmental interest in protecting the federal fisc. By allowing such calls to be made more cost-effectively, the government-debt exception directly advances that interest. It does so, moreover, without seriously impairing the privacy interests that Congress enacted the TCPA to protect. The exception subjects only a narrow range of potential recipients to a narrow range of potential calls, and the calls that it authorizes are communications for which the recipients have a

significantly reduced expectation of privacy. The government-debt exception therefore is narrowly tailored to further a significant governmental interest.

### 3. Even if the government-backed debt exception were found unconstitutional, the remedy would be severance of that provision, not striking the entire TCPA

If the Court holds that the government-debt exception violates the First Amendment, the Court should sever that provision from the rest of the TCPA, leaving the automated-call restriction intact. Severability "is a question of legislative intent." Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 683 n.5 (1987); see *United States v. Booker*, 543 U.S. 220, 246 34 (2005) (Court in deciding severability asks "what 'Congress would have intended' in light of the Court's constitutional holding") (citation omitted). In conducting that inquiry, the Court has applied a "presumption * * * in favor of severability." Regan, 468 U.S. at 653 (plurality opinion); *see Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) ("'Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem,' severing any 'problematic portions while leaving the remainder intact.'") (citation omitted). Thus, "the invalid portions of a statute are to be severed unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not." *INS v. Chadha*, 462 U.S. 919, 931-932 (1983) (brackets, citation, and internal quotation marks omitted). Further, the Federal Communications Act of 2934, of which the TCPA is a subsection of, provides that if any section of the Act is found invalid, the remainder of the provisions of the Act remain unaffected. 47 U.S.C.A. § 608.

The history of the TCPA confirms that Congress would have wanted the automated-call restriction to remain in effect independently of the government-debt exception. Congress enacted the automated-call restriction in 1991, and the restriction stood until 2015 without any exception

for calls to collect government-backed debts. That history shows that, for 24 years, Congress preferred an automated-call restriction without the exception over no automated-call restriction at all. There is no indication that, if Congress had known that the automated-call restriction and the government debt exception could not constitutionally coexist, it would have wanted to return to the pre-TCPA regime, exposing all Americans to millions of unwanted automated calls to their cell phones every day.  The Court therefore should conclude that the government-debt exception is severable from the remainder of the TCPA.  That conclusion is consistent with this Court's resolution of similar issues involving the severability of exceptions to statutory rules. Respondents contend that the automated-call restriction, rather than the government-debt exception, is the focus of their First Amendment challenge. But while respondents seek to escape the prohibition that the automated-call restriction imposes, their claim of unconstitutional content discrimination depends entirely on the existence of the government-debt exception. Severing the exception would eliminate that disparity in a manner consistent both with the First Amendment and with Congress's intent.

### 4.  This Court should not stay proceedings to await a decision in the *Barr* case

This Court has the general "power to stay proceedings [that] is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis* v. *North American Co.,* 299 U.S. 248, 254 (1936).  "'[T]he suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else. ***Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles***

*the rule of law that will define the rights of both.*'" *Nederlandse* v. *lsbrandtsen,* 339 F.2d

440, 442 (2nd Cir. l964) (quoting *Landis,* 299 U.S. at 254-255). (emphasis added).

In deciding whether to issue a *"Landis"* stay, the court "must weigh competing

interests and maintain an even balance." *Landis* v. *North American Co., supra,* 299 U.S. at

254-55; *Marquis* v. *F.D.LC.,* 965 F.2d 1148, 1155 (1st Cir. 1992) ("stays cannot be

cavalierly dispensed: there must be good cause for their issuance; they must be reasonable in

duration; and the court must ensure that competing equities are weighed and balanced.")

Typically, the courts will consider some or all of the following factors:

> (i) the interests of the civil plaintiff in proceeding expeditiously with the
> civil litigation, including the avoidance of any prejudice to the plaintiff
> should a delay transpire; (ii) the hardship to the defendant, including the
> burden placed upon him should the cases go forward in tandem; (iii) the
> convenience of both the civil and criminal courts; (iv) the interests of third
> parties; and (v) the public interest.

*Kappel v. Confort,* 914 F.Supp. 1056, 1058 *(S.D.N.Y.1996); Microfinancial, Inc. v.*

*Premier Holidays International, Inc., supra,* 385 F.3d 75, 78 (1st Cir. 2004).

In the seminal *Landis* case, for example, two companies had each commenced

litigation in the District of Columbia seeking to invalidate a federal statute. 299 U.S. at 249.

The S.E.C. filed a motion to stay those litigations pending the outcome through appeal of a

different litigation that the S.E.C. had commenced in a New York district court seeking to

enforce the same statute, but against different companies. *Id.* at 250. The District of

Columbia court issued a staying pending the outcome of the other litigation through

appeals. *Id.* at 253. The U.S. Supreme Court reversed, ruling that "[o]nly in rare

circumstances will a litigant in one cause be compelled to stand aside while a litigant in

another settles the rule of law that will define the rights of both.,, *Id.* at 255. While the

Supreme Court remanded to the district court to determine whether a stay pending determination of the then imminent decision of the New York district court in the second litigation was appropriate, the Court made clear that any indefinite stay through the appeals process would be an abuse of discretion. *Id.* at 256.

Numerous other courts have followed *Landis,* particularly insofar *as* it stands for the proposition that stays should not prejudice parties in the stayed case who are not parties in the other case(s), and insofar as it stands for the rule that indefinite stays of one case pending appeals in another case generally constitute an abuse of discretion. *E.g., Dellinger v. Mitchell,* 442 F.2d 782, 787 (D.C. Cir. 1971) (D.C. Circuit reverses stay order because, among other things it was extended through all possible appeals in other case).

In this case, it is submitted that there is no basis for a stay. Neither the district court, nor the Court of Appeals found merit in the Plaintiff's effort to strike the entire TCPA as a result of the government-backed loan provision. Further, the Second Circuit has not ever found the TCPA or any of its provisions unconstitutional.

The Defendant's note that oral argument is scheduled for May 6, 2020. However, that date has already been postponed once. Due to the current Covid-19 crisis, there is simply no indication when a decision will be made on that case by the Supreme Court. It is distinctly possible that the case could be pushed into the next term, which could result in a decision not being made until 2021.

This case was filed two years ago. It is simply not fair to make the Plaintiff wait for an undetermined length of time to wait for the extremely unlikely possibility that the Supreme Court will strike the entire TCPA due to the alleged unconstitutionality of one of its provision. Accordingly, Plaintiff opposes any stay of proceedings in this case.

## **CONCLUSION**

By reason of the above, this Court should deny Navient's objections and adopt the Report and Recommendation of the Magistrate Judge in its entirety.

Respectfully submitted,

Dated:  April 29, 2020           s/Kenneth R. Hiller_____
                               Kenneth R. Hiller, Esq.
                               Law Offices of Kenneth Hiller PLLC
                               6000 North Bailey Avenue, Ste. 1A
                               Amherst, New York 14226
                               (716)564-3288
                               Email: khiller@kennethhiller.com